IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM ADLER and JIM S. ADLER, P.C., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. <u>3:21-cv-2494</u> |
| | § | |
| ADAM RAMJI and RAMJI LAW GROUP, | § | |
| P.C., | § | **JURY DEMANDED** |
| | § | |
| Defendants. | § | |

## <u>ORIGINAL COMPLAINT</u>

Plaintiffs Jim Adler and Jim S. Adler, P.C., appearing through their undersigned counsel, allege as follows:

### NATURE OF ACTION AND JURISDICTION

1.     This is an action for trademark infringement and unfair competition under the Trademark Act of 1946, as amended, 15 U.S.C. §1051 *et seq.* ("Lanham Act"); for trademark dilution under the Texas Business and Commerce Code; and for breach of contract under Texas common law.

2.     This Court has jurisdiction over the subject matter of this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. §1121, and Chapter 85 of the Judiciary and Judicial Procedure Code, 28 U.S.C. §§1331 and 1338, and has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367(a).

3.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §§1391(b) and (c) because a substantial part of the events giving rise to the claim occurred in the district, and because Defendants have conducted business in the Northern District of Texas and are subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

4.      Plaintiff Jim Adler is a Texas resident domiciled in Houston.

5.      Plaintiff Jim S. Adler, P.C. (the "Adler Firm") is a Texas corporation with a principal place of business at 3D/International Tower, 1900 West Loop South, 20th Floor, Houston, Texas 77027.

6.      Defendant Adam Ramji is a Texas resident domiciled in Houston.

7.      Defendant Ramji Law Group, P.C. is a Texas corporation with a principal place of business at 9186 Katy Freeway, Houston, Texas 77055.

## STATEMENT OF THE CASE

8.      Despite agreeing to, Adam Ramji and the Ramji Law Group, P.C., (collectively herein "Ramji") simply won't stop using the federally registered trademarks owned by Jim Adler and the Adler Firm (collectively herein "Adler").  In 2019, Adler sued the Ramji Law Group based on the Group's participation in an intentional scheme to confuse consumers through the purchase of Plaintiffs' federally registered trademarks as keywords for advertisements on Google's search engine. *See Jim S. Adler, P.C. v. Law Street Marketing, LLC et al.*, No. 3:19-CV-2026 (N.D. Tex. filed Aug. 23, 2019) [hereinafter, the "First Suit"].  In January 2020, that lawsuit was resolved via a settlement agreement (the "Agreement," attached hereto as **Exhibit A**).  Under the plain terms of the Agreement, Ramji is prohibited from using Adler's trademarks "for any purpose whatsoever, including but not limited to purchasing the marks as keywords in search-engine advertisements."

9.      It didn't take Ramji long to start breaching the Agreement.  Adler recently learned Ramji has purchased Adler's trademarks in connection with keyword search engine advertisements on over 200 occasions since at least May 2021.  Defendants' renewed use of Plaintiffs' trademarks constitutes trademark infringement and unfair competition under federal law, trademark dilution

under state law, and breach of contract under Texas law. Plaintiffs are entitled to all relief sought herein, including actual damages, disgorgement of Defendants' profits, liquidated damages under the Agreement, and attorneys' fees.

**FACTS**

**A.    Jim Adler, The Texas Hammer**

10.    The Adler Firm is a preeminent Texas personal injury law firm, representing injured parties in all types of personal injury cases, with a particular focus on auto accidents and commercial vehicle / eighteen-wheeler accidents. Adler views their practice as "safety law," and focus on trying to help Texas injury victims and their families recover to the greatest extent possible, while at the same time using the legal system to make society a safer place to live.

11.    The Adler Firm was formed and is led by Jim Adler, who has become widely known in Texas over the course of his fifty-four year (and counting) legal career. Jim Adler graduated from the University of Texas School of Law and was admitted to practice law by the State Bar of Texas in 1967. After brief stints serving in a legal capacity in both the military and law enforcement, Jim Adler went into private practice in 1973, hanging his own shingle and starting the Adler Firm.

12.    Since beginning as a solo practitioner, Jim Adler has grown the Adler Firm into one of the largest, most widely recognized, and most successful personal injury law firms in Texas. The Adler Firm currently has four offices in Houston, Dallas, San Antonio, and Channelview. The firm employs approximately 300 people, including 27 lawyers.

13.    Adler's success is the result of decades of hard work, building a strong reputation for aggressively representing Texas injury victims and their families, as embodied in his persona

as The Texas Hammer.  Over the years, Plaintiffs have built a strong referral base comprised of several generations of satisfied clients.

14.    This reputation is the result of Plaintiffs hard work, as well as the significant effort and expense that Plaintiffs have incurred in promoting themselves throughout Texas.

15.    In 1977, the United States Supreme Court upheld the right of lawyers to advertise their legal services, holding it was commercial free speech protected under the First Amendment. Shortly after that decision, Jim Adler became one of the first lawyers in Texas to advertise on television.  Plaintiffs' advertising efforts stem from a desire to provide knowledge to and serve members of the community that are unfamiliar with the legal system or otherwise unaware of their legal rights.  That commitment remains one of the driving forces behind Plaintiffs' practice.

16.    Plaintiffs' advertisements have enabled Adler to develop very strong recognition of his brand and persona as The Texas Hammer among the public.  As the Dallas Business Journal wrote in 2015, for decades "Jim Adler, 'The Texas Hammer,' has used an aggressive, memorable advertising campaign to make his law firm a household name in several areas of the state."  The Dallas Business Journal also noted that, "[a]s far as personal injury lawyers go, Jim Adler might be the most well known in Texas."

**B.    Plaintiffs' Famous Brand and Trademark**

17.    Since at least the 1990s, Plaintiffs have consistently and continuously used several trademarks, including JIM ADLER, JIM ADLER THE TOUGH SMART LAWYER, THE HAMMER, and THE TEXAS HAMMER (collectively, the "Adler Marks") to identify and promote Plaintiffs and the legal services they provide.

18.    The Adler Marks are inherently distinctive and serve to identify and indicate the source of Plaintiffs' services to the consuming public.

19.    The Adler Marks are famous in the State of Texas under TEX. BUS. & COM. CODE §16.103.  The Adler Marks became famous in Texas before Defendants' use described herein.

20.    Adler owns several federal trademark registrations for the Adler Marks.  *See* U.S. Reg. Nos. 3,498,091; 3,507,257; 3,503,851; and 3,730,395.  These registrations are valid and subsisting, and each is incontestable under 15 U.S.C. §1065.  True and correct copies of these registrations are attached as **Exhibit B**.

21.    In order to build a strong brand and persona for aggressively representing Texas injury victims and their families as The Texas Hammer, Plaintiffs advertise on television, radio, billboards, and on the internet.  The Adler Marks are consistently used in Plaintiffs' advertisements across all media formats.  The ads themselves are strategically designed to position Adler and his firm's lawyers as leading attorneys capable of handling all types of personal injury claims, with an emphasis on auto and truck accidents.  The ads often center on Adler's persona as The Texas Hammer, regularly referencing his nickname and including other hammer-related indicia, such as Adler wielding a sledgehammer and using phrases like "It's hammer time!"  The bulk of Plaintiffs' advertising is in Texas's three largest markets—Houston, San Antonio, and Dallas-Fort Worth.

22.    Since 2000, Adler has spent over $100 million on television, internet, radio, and billboard advertisements targeting the Houston, San Antonio, and Dallas-Fort Worth markets.

23.    For each of these three major Texas markets, Plaintiffs run numerous television advertisements in both English and Spanish on multiple television stations throughout the year.  In Houston, Plaintiffs run approximately 45,000 television commercials per year.  In San Antonio, they run about 87,000 television commercials per year.  And in Dallas-Fort Worth, Plaintiffs run approximately 85,000 television commercials per year.

24.    The use of television advertisements in these major Texas markets has allowed Plaintiffs to reach millions of Texans and build an incredibly strong brand and reputation among the public.  The Houston market is the eighth largest television market in the nation, reaching more than 6 million viewers.  The San Antonio market is the thirty-first largest television market in the nation, reaching more than 2.3 million viewers.  The Dallas-Fort Worth market is the fifth largest television market in the nation, reaching more than 6.8 million viewers.  Combined, Plaintiffs' television advertising allows them to reach over 15 million people—more than half of all Texans.

25.    A review of the television advertisements Plaintiffs ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm.  In 2019, over a four-week period and not including commercials run on cable, television advertisements for Plaintiffs repeatedly reached a large portion of the 25-to-54-year-old demographic in each of these major markets.    In the Houston market, Plaintiffs' advertisements reached 70.4% of the demographic, with the average viewer seeing each ad 15.2 times, for 29,563,125 total impressions. In the San Antonio market, their advertisements reached 47.5% of the demographic, with the average viewer seeing each ad 14.0 times, for 6,420,146 total impressions.  And in the Dallas-Fort Worth market, Plaintiffs' advertisements reached 58.7% of the demographic, with the average viewer seeing each ad 13.9 times, for 23,406,564 total impressions.

26.    For each of these major Texas markets, Plaintiffs run numerous radio advertisements in both English and Spanish on multiple radio stations throughout the year.  For Houston, San Antonio, and Dallas-Fort Worth, Plaintiffs run approximately 23,000 radio commercials per year in each market.

27.    The use of radio advertisements in these major markets has allowed Plaintiffs to reach millions of Texans and enhance their brand recognition.  The Houston market is the sixth-

largest radio market in the nation, reaching more than 5 million listeners.  The San Antonio market is the twenty-sixth largest radio market in the nation, reaching more than 1.8 million listeners.  And the Dallas-Fort Worth market is the fifth-largest radio market in the nation, reaching more than 5.3 million listeners.  Combined, Plaintiffs' radio advertising reaches over 12 million Texans.

28.    A review of the radio advertisements Plaintiffs ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm.  In 2019, over a four-week period, radio advertisements for Plaintiffs repeatedly reached a majority of the 25-to-54-year-old demographic in each of these major markets.  In the Houston market, Plaintiffs' radio advertisements reached 87% of the demographic, with the average listener hearing each ad 8.9 times, for 23,519,600 total impressions.  In the San Antonio market, their advertisements reached 67% of the demographic, with the average listener hearing each ad 9.2 times, for 6,258,000 total impressions.  And in the Dallas-Fort Worth market, Plaintiffs' advertisements reached 56.1% of the demographic, with the average listener hearing each ad 7.1 times, for 13,133,600 total impressions.

29.    For each of these major Texas markets, Plaintiffs run numerous billboard advertisements in both English and Spanish.  At any given time, Plaintiffs have approximately 40 billboard advertisements in the Houston market, 20 in the San Antonio market, and 40 in the Dallas-Fort Worth market.  On average, the billboard advertisements purchased by Plaintiffs generate 25 to 30 million impressions per week.

30.    Plaintiffs' advertisements, all of which prominently incorporate the Adler Marks, have enabled Plaintiffs to develop very strong brand recognition in Texas.  The Houston Chronicle wrote in 2007 that "[e]verybody knows what Adler sounds like from his ceaseless TV

commercials." In 2015, the Dallas Morning News named one of Plaintiffs' television commercials to a list of five of the most memorable attorney ads in Dallas-Fort Worth.

31.    More recently, a montage comprised of Plaintiffs' English- and Spanish-language television advertisements was featured on a 2019 episode of *Last Week Tonight*, an Emmy-award winning HBO news satire program broadcast around the globe. Plaintiffs were again featured on *Last Week Tonight* in August 2021.

32.    As a result of these efforts by Plaintiffs, the consuming public throughout the United States, including in Texas, widely recognizes and associates the Adler Marks with Plaintiffs. Through Plaintiffs' long use and promotion of the Adler Marks, the marks have become distinctive to designate Plaintiffs, to distinguish Plaintiffs and their services from those of others, and to distinguish the source or origin of Plaintiffs' services. As a result, Plaintiffs have acquired strong and enforceable common law rights in the Adler Marks.

**C.    Plaintiffs' Online Advertising**

33.    As with their television advertising, Jim Adler and the Adler Firm were also early leaders among lawyers in using the internet to advertise their legal services. Since 1997, Jim Adler and the Adler Firm have marketed their legal services through the "jimadler.com" domain. In 2018, jimadler.com averaged more than 52,000 visitors to the site per month.

34.    Plaintiffs also engage in a substantial amount of online advertising, including purchasing keyword search engine advertising to drive internet traffic to the Adler Firm. Plaintiffs spend a considerable sum of money each month to advertise online, including by purchasing keyword ads through Google's search engine. Plaintiffs spend hundreds-of-thousands of dollars every year purchasing keyword ads for their own Adler Marks.

35.     Jim Adler and the Adler firm only purchase keywords that are their own marks or generic terms related to the type of cases they handle.  For example, Plaintiffs purchase keyword ads for "Jim Adler" or "Texas Hammer," as well as when someone searches more generically for "car accident lawyer."  The vast majority of keyword ads that Plaintiffs purchase is for someone searching for their own marks, rather than generic terms.  Jim Adler and the Adler Firm do not purchase keywords related to any other lawyer's name, firm, or mark.

36.     All the search engine advertisements purchased by Jim Adler and the Adler Firm prominently include the Adler Marks and clearly identify the Adler Firm as the source of the advertisement.  Here is an example of one such advertisement, as it appeared from a Google search:



## D.    Defendants Adam Ramji and Ramji Law Group

37.     Defendant Adam Ramji is a personal injury attorney offering legal services through Defendant Ramji Law Group.

38.     Upon information and belief, Adam Ramji is the sole owner of Ramji Law Group and directs and controls Ramji Law Group's advertising strategy, including the purchase of the Adler Marks for keyword advertisements.  As Ramji Law Group's sole owner, Adam Ramji has the authority to bind Ramji Law Group in transactions.

39.    In association with or as part of Ramji Law Group, Defendants operate a call center through which they solicit personal injury cases, including through keyword advertisements.

**E.    The First Suit and Settlement Agreement**

40.    Plaintiffs filed suit against Ramji Law Group in August 2019, alleging *inter alia* trademark infringement and unfair competition.

41.    The allegations against Ramji Law Group in the First Suit centered on Ramji Law Group's purchase of leads from Law Street Marketing, LLC d/b/a Premium Injury Help and Exclusive Legal Marketing, Inc. d/b/a Premium Injury Help (collectively, "Premium").  Premium was a "lead generator" that ran keyword advertisements on mobile devices with generic language promoting personal-injury legal services.

42.    To carry out Premium and Ramji Law Group's illegal scheme, Premium purchased the Adler Marks to trigger keyword advertisements on mobile devices through Google's search engine using Google's "click-to-call" tool.  When a consumer clicks on a click-to-call ad on a mobile device, the consumer's device automatically places a phone call to the advertisement's owner.  As such, Premium's click-to-call keyword advertisements did not give consumers the ability to click through to a separate website or garner any further information before connecting consumers via phone with a call center operated by Premium.

43.    Adler further alleged that Premium employees who answered such calls were instructed to answer the call with a generic greeting such as "did you have an accident" or "tell me about your accident."  This continued the scheme of deceiving consumers into believing that they had contacted the Adler Firm and were speaking with the Adler Firm, or someone affiliated with the Adler Firm.  The aim of Premium and Ramji Law Group's scheme was to keep confused consumers, who were specifically searching for Jim Adler and the Adler Firm, on the phone and

talking to Premium's employees as long as possible in a bait-and-switch effort to build rapport with the consumer and ultimately convince them to engage Ramji Law Group instead.

44.    As part of the scheme, Premium paid increasingly higher amounts using proceeds from its referral agreement with Ramji to bid on the Adler Marks as keywords that triggered Premium's advertisements.  The increasingly higher bids not only drove up the cost for Adler to purchase his own marks to promote his own services, but also allowed Premium's advertisements to appear next to or before Plaintiffs' own ads.  By having its confusing ads appear next to or before Plaintiffs' ads, Premium was able to confuse consumers and cause a higher number of consumers searching specifically for Jim Adler or the Adler Firm to instead mistakenly call Premium, after which Premium would refer the prospective clients to Ramji Law Group.

45.    Adler alleged that Ramji had actual knowledge of Premium's scheme, including Premium's keyword purchases, online advertisements, and call-center activities, and that Ramji directed Premium to engage in the scheme on its behalf.

46.    The First Suit was resolved pursuant to a settlement agreement.  The Effective Date of the Agreement is January 9, 2020.  Defendants Adam Ramji and Ramji Law Group are both signatories and bound by the terms of the Agreement.

47.    Defendants agreed that Ramji and "Ramji's Affiliates" would "never use, cause to be used, [or] suggest to be used . . . the ADLER Marks or any other mark belonging to Jim Adler or the Adler Firm, or any confusingly similar marks, for any purpose whatsoever, including but not limited to purchasing the marks as keywords in search-engine advertisements."

48.    The Agreement defines "Ramji's Affiliates" as "all partners, owners, shareholders, joint venturers, business associates, employees, agents, spouses, family members, or employers of Ramji; all entities now, in the past, or in the future related to or controlling, controlled by, or under

common control with one or more of Ramji and Ramji's Affiliates; and all predecessors or successors in interest of Ramji or Ramji's Affiliates."

49.     The Agreement contains a valid and enforceable liquidated-damages clause.  The liquidated-damages clause states, in part:

> If Ramji or Ramji's Affiliates violate any terms of this Agreement, Ramji will be liable to Jim Adler and the Adler Firm for liquidated damages in the amount of $5,000 for every business day after the Effective Date on which they are in violation of this Agreement. . . . Ramji further agrees that, if Ramji or Ramji's Affiliates violate this Agreement, in addition to any other damages provided by law, Jim Adler and the Adler Firm will be entitled to and shall recover from Ramji any and all attorneys' fees, expenses, and costs arising from Ramji's or Ramji's Affiliates' violation of this Agreement, including but not limited to attorneys' fees, expenses, and costs arising from enforcing this Agreement. Ramji acknowledges and agrees that the liquidated damages amounts provided for in this paragraph are in addition to any attorneys' fees, expenses, and costs, and any further injunctive relief or damages that may be awarded to Jim Adler and the Adler Firm in connection with enforcing their rights under this Agreement.

50.     Under the Agreement's venue-selection clause, "[t]he exclusive venue for any litigation commenced between the parties regarding this Agreement will be the United States District Court for the Northern District of Texas, Dallas Division," where both parties "expressly consent to personal jurisdiction."

**F.     Defendants' Renewed Infringement of the Adler Marks**

51.     Ramji's scheme alleged herein is a continuation of the scheme from the First Suit. Ramji has merely cut out the middleman, Premium.

52.     On information and belief, Ramji is again purchasing the Adler Marks as keywords on mobile devices, which triggers advertisements for Defendants' services when consumers enter the Adler Marks as search terms in Google's search engine.  Attached hereto as **Exhibit C** is a spreadsheet showing the over 200 occasions since May 2021 in which Ramji has purchased Adler's trademarks in connection with keyword search engine advertisements.

53.    Like the advertisements at issue in the First Suit, many of Ramji's new keyword ads are click-to-call advertisements.  Ramji purchases the Adler Marks as keywords on mobile devices and uses the click-to-call tool because of the likelihood that consumers will be confused and quickly click on Defendants' ad not realizing that it is unaffiliated with Plaintiffs.

54.    Examples of Ramji's most recent ads are shown below, which use Adler's Marks as search-engine keywords and prominently incorporate generic terms and/or the click-to-call feature:



55.    The most prominent text in Ramji's keyword ads is generic language and/or a generic telephone number that does not identify Ramji or the origin of the ads.  On information and belief, Ramji uses generic language and/or a generic telephone number as the most prominent text in his advertisements so that consumers who are searching specifically for Adler will click

Ramji's advertisement before realizing the ad is unaffiliated with Plaintiffs. This is particularly true on mobile devices, where consumers are quickly searching in the stressful aftermath of an accident, the typeface of the ads is much smaller, and the only content displayed on the screen is an advertisement directly below one or more of the Adler Marks, which consumers have entered as a search term.

56.    Ramji is also bidding increasingly higher amounts for the Adler Marks as keywords that trigger advertisements on Google's search engine.  As in the First Suit, this practice drives up the cost for Plaintiffs to purchase their own marks as keywords and allows Ramji's advertisements to appear next to or before Plaintiffs' own ads.  By having click-to-call advertisements appear next to or before Plaintiffs' ads, Ramji can confuse consumers and cause a higher number of consumers searching specifically for Adler to instead mistakenly call Ramji.

57.    On information and belief, calls generated by Ramji's click-to-call advertisements triggered by the Alder Marks are routed to a call center operated by Ramji.  Ramji's call center engages in tactics identical or similar to those engaged in by Premium.  Ramji's call center keeps confused consumers, who were searching specifically for Adler, on the phone and talking for as long as possible in a bait-and-switch effort to build rapport and convince them to engage Ramji.

58.    In this manner, Ramji has wrongfully induced prospective clients trying to reach Plaintiffs into engaging Ramji for his competing services.  The nature of Defendants' scheme leaves little doubt as to their bad-faith intent to trade on Plaintiffs' goodwill and reputation.

59.    Ramji has purchased the Adler Marks in connection with keyword advertisements on at least 75 days since at least May 2021, including on more than 200 separate occasions.

60.    Ramji is using the Adler Marks in commerce.  Ramji's use of the Adler Marks began long after Plaintiffs developed rights in the Adler Marks and after the Adler Marks became

famous in Texas.

61.    Defendants are not affiliated with or sponsored by Plaintiffs, nor have Defendants been authorized by Plaintiffs to use the Adler Marks, or any mark confusingly similar to the Adler Marks.

**G.    Effect of Defendants' Scheme**

62.    Defendants' unauthorized use of the Adler Marks is likely to cause confusion, to cause mistake, and/or to deceive customers and potential customers of the parties, at least as to some affiliation, connection, or association of Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' services by Plaintiffs.

63.    Defendants' unauthorized use of the Adler Marks falsely designates the origin of his services and falsely and misleadingly describes and represents facts with respect to Defendants and their services.

64.    Defendants' unauthorized use of the Adler Marks enables Defendants to trade on and receive the benefit of goodwill built up at great labor and expense by Plaintiffs over the years, and to gain acceptance for their services not solely on their own merits, but on the reputation and goodwill of Plaintiffs, the Adler Marks, and Plaintiffs' services.

65.    Defendants' unauthorized use of the Adler Marks is likely to dilute the famous Adler Marks in Texas as their use weakens the ability of the marks to distinguish the source of Plaintiffs' services.

66.    Defendants' unauthorized use of the Adler Marks unjustly enriches Defendants at Plaintiffs' expense.  Defendants have been and continue to be unjustly enriched by obtaining a benefit from Plaintiffs by taking undue advantage of Plaintiffs and their goodwill.  Specifically, Defendants have taken undue advantage of Plaintiffs by trading on and profiting from the goodwill

in the Adler Marks developed and owned by Plaintiffs, resulting in Defendants wrongfully obtaining a monetary and reputational benefit for their own business and services.

67.    Defendants' unauthorized use of the Adler Marks constitutes a breach of the Agreement, including because the Agreement's terms require Ramji to refrain from using the Adler Marks in connection with keyword advertisements. Ramji has been in breach of the Agreements' terms for at least 75 days since the Effective Date of the Agreement.

68.    Defendants' unauthorized use of the Adler Marks removes from Plaintiffs the ability to control the nature and quality of the services provided under the Adler Marks and places the valuable reputation and goodwill of Adler in the hands of Defendants, over whom Plaintiffs lack control.

69.    Defendants' unlawful course of conduct described herein has harmed Plaintiffs, including by diverting prospective clients away from Plaintiffs and by significantly increasing the costs for Adler to use keyword advertisements triggered by his own registered trademarks.

70.    Unless these acts of Defendants are restrained by this Court, they will continue, and they will continue to cause irreparable injury to Plaintiffs and to the public for which there is no adequate remedy at law.

## COUNT I: FEDERAL TRADEMARK INFRINGEMENT

71.    Plaintiffs repeat the allegations above as if fully set forth herein.

72.    The acts of Defendants complained of herein constitute infringement of the federally registered Adler Marks in violation of 15 U.S.C. §1114(1).

73.    Defendants' acts complained of herein have been deliberate, willful, intentional, or in bad faith, with full knowledge and conscious disregard of Plaintiffs' rights in the Adler Marks, and with intent to cause confusion and to trade on Plaintiffs' vast goodwill in the Adler Marks. In

view of the egregious nature of Defendants' infringement, this is an exceptional case within the

meaning of 15 U.S.C. §1117(a).

<h2 style="text-align:center"><u>COUNT II: FEDERAL UNFAIR COMPETITION</u></h2>

74.     Plaintiffs repeat the allegations above as if fully set forth herein.

75.     The acts of Defendants complained of herein constitute trademark infringement,

false designation of origin, false or misleading descriptions or representations of fact and unfair

competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

76.     Plaintiffs have been damaged by Defendants' acts of trademark infringement, false

designation or origin, false or misleading descriptions or representations of fact and unfair

competition.

<h2 style="text-align:center"><u>COUNT III: STATE TRADEMARK DILUTION</u></h2>

77.     Plaintiffs repeat the allegations above as if fully set forth herein.

78.     The acts of Defendants complained of herein constitute dilution by blurring of

Plaintiffs' famous Adler Marks in violation of Texas Business and Commerce Code §16.103.

79.     Defendants willfully intended to trade on the recognition of the famous Adler

Marks.

<h2 style="text-align:center"><u>COUNT IV: COMMON LAW BREACH OF CONTRACT</u></h2>

80.     Plaintiffs repeat the allegations above as if fully set forth herein.

81.     The acts of Defendants complained of herein, including the purchase of the Adler

Marks in connection with keyword advertisements, constitutes breach of contract under Texas

common law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that:

(a)    Defendants, as well as their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of them, be permanently enjoined and restrained from using the Adler Marks and any other mark or name confusingly similar to or likely to dilute the Adler Marks, including by purchasing the Adler Marks or any confusingly similar marks as keyword advertisements, and from any attempt to retain any part of the goodwill misappropriated from Plaintiffs;

(b)    Defendants, as well as their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of them, be required to deliver up and destroy all internet postings and advertisements, and any other materials bearing or using the Adler Marks and/or any other mark or name that is confusingly similar to or likely to dilute the Adler Marks;

(c)    Defendants be ordered to file with this Court and to serve upon Plaintiffs, within thirty (30) days after the entry and service on Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

(d)    Plaintiffs recover all damages they have sustained as a result of Defendants' activities, and that said damages be trebled;

(e)    An accounting be directed to determine Defendants' profits resulting from their activities and that such profits be paid over to Plaintiffs, increased as the Court finds to be just under the circumstances of this case;

(f)    Plaintiffs recover liquidated damages under the parties' Agreement in the amount of $5,000 per day that Defendants have violated the terms of the Agreement;

(g)    Plaintiffs recover their reasonable attorneys' fees under the parties' Agreement;

(h)    Plaintiffs recover their costs of this action and prejudgment and post-judgment interest; and

(i)    Plaintiffs recover such other relief as the Court may deem appropriate.

## **JURY DEMAND**

Plaintiffs demand a jury trial in accordance with Federal Rule of Civil Procedure 38(b).

Dated:  October 12, 2021                    Respectfully submitted,

*/s/ Jered E. Matthysse*
Jered E. Matthysse
   Texas Bar No. 24072226
   jmatthysse@pirkeybarber.com
Giulio Yaquinto
   Texas Bar No. 24107292
   gyaquinto@pirkeybarber.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 78702
(512) 322-5200
(512) 322-5201 (fax)

*/s/ Garrett W. Mize*
Garrett W. Mize
   Texas Bar No. 24089610
   gmize@jimadler.com
JIM S. ADLER AND ASSOCIATES
The Tower at City Place
2711 North Haskell Avenue, Suite 2500
Dallas, Texas 75204
(214) 220-3224
(214) 220-3233 (fax)

Kurt Kuhn
    Texas Bar No. 24002433
    Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
2310 Rutland Street
Houston, Texas 77008
(713) 344-1530
(833) 514-6755 (fax)

COUNSEL FOR PLAINTIFFS